# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  56021-6-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| BRIA JESSIE DANNER, | |
| Appellant. | |

CRUSER, A.C.J. — Bria Jessie Danner, a woman with a significant mental health history, killed a woman with whom she had been having a dispute over a hotel bill. A jury rejected Danner's insanity defense and convicted her of first degree premeditated murder. Danner appeals, arguing that (1) the trial court abused its discretion when it required her to submit to a third sanity evaluation, (2) the State engaged in prejudicial prosecutorial misconduct when it misstated the law on the insanity defense in its closing argument, (3) her trial counsel provided ineffective assistance of counsel when he failed to object to this improper argument or request a curative instruction, and (4) no rational jury would have rejected her insanity defense.

We hold that (1) any potential error in requiring Danner to participate in a third evaluation was harmless error because the opinion testimony of the expert who conducted this evaluation was based on the same facts disclosed in the first two examinations and relied on by the other experts, (2) the prosecutor's argument was not improper, (3) defense counsel did not provide ineffective assistance by failing to object to this argument, and (4) the evidence was sufficient to allow the jury to have found that Danner failed to prove her insanity defense. Accordingly, we affirm.

No. 56021-6-II

FACTS

I. BACKGROUND

A. THE MURDER

As of 2019, Danner had lived in the Aberdeen area for ten years and was known by several police officers. Danner was homeless and had an extensive history of mental health issues dating from at least 2009.

Danner did not like staying in homeless encampments because she was fearful that individuals there would rob or steal from her, so she occasionally used her Supplemental Security Income (SSI) benefits to stay at local hotels. But she would not stay at some of the local hotels because she believed that some of them had "attempted to poison her." Report of Proceedings (RP) at 56.

In November 2018, Danner stayed at the GuestHouse Inn in Aberdeen. Danner believed the Inn was charging her a special rate that would enable her to stay there most of the month. But after a few nights, she learned that this was not the case.

Danner was upset by this revelation, and even contacted the police over this matter. Although others, including a police officer, had explained to her that she had not been overcharged, Danner was unable to accept this fact.

At some point over the next month, Danner confronted the owner of the hotel, Sung Sil Kim. According to Danner, Kim had kicked her, and Danner attempted to call the police for "permission to kick her back." RP at 56.

At about 10:00 AM, on January 30, 2019, Sergeant Darrin King, who had interacted with Danner between 20 to 30 times over the previous years, responded to a welfare check near the fire

2

station. When King arrived, Danner was in the street and was yelling for no reason, which was not unusual behavior for her. But she had already talked to the aid personnel and was getting ready to move somewhere else.

King later testified Danner had "some level of mental [illness] issues," and he was familiar with her doing "things that just are abstract and abhorrent and not criminal, just bizarre behavior." RP at 371. He stated that during his contact with Danner on the morning of January 30, she was acting as she normally did.

At about 3:25 that afternoon, Danner approached the Inn, hid some of the several bags she was carrying in the bushes next to the building, and entered the lobby area. Danner approached the coffee bar and fixed herself a cup of coffee while concealing a knife in her other hand. After filling a coffee cup, Danner put the coffee down on the desk. When Kim looked her way, Danner attacked Kim and repeatedly stabbed her with the knife. Following the initial stabbing, Danner started to leave. But she returned, appeared to try to pick up the phone, and then continued to stab Kim. Danner then left the building.

Kim suffered 25 sharp force injuries, and both of her lungs and her thoracic aorta were pierced. Kim had died by the time emergency assistance arrived. The attack was videotaped by the Inn's security system. The police obtained the surveillance tapes that showed the stabbing incident.[1]

When Danner left the Inn, her hands and clothing had blood on them. Just outside of the Inn, she attempted to wipe the blood off of her hands with some napkins, which she tossed on the

---

[1] This video was shown to the jury.

3

ground. After she collected some of the items she had placed in the bushes, she walked into the street while "waving her arms frantically as if . . . she was trying to stop traffic." RP at 232.

Jennifer Ottosen, who was working at a store across the street from the Inn observed Danner leave the Inn, pull a bag or backpack out of the nearby bushes, and then cross the nearby road. When Danner stopped in front of the store, Ottosen observed that there was "a lot of blood on [Danner's] hands [and] clothes." RP at 233. Ottosen later showed the store security video to the police and provided them with a copy.[2]

After passing Ottosen's store, Danner walked to the nearby homeless encampment located next to the Chehalis River. Her friend Azucena Fernandez-Island noticed Danner was bleeding and wrapped Danner's hand. Fernandez-Island thought Danner had been in a fight because she had heard people threatening Danner before and knew "a couple of people who wanted to get in a fight with her." RP at 271. Fernandez-Island asked Danner if she was okay, and Danner said that she was. But Danner did not explain how she got the blood on her hands, and Fernandez-Island did not ask her to explain and she did not closely examine Danner's hands.

When someone in the encampment shouted out a warning that the police were coming, Danner and Fernandez-Island walked away from the encampment and headed separate directions. Fernandez-Island later testified that Danner was normally "a little off," and that Danner was not acting any differently when she saw her that day. RP at 275.

Danner proceeded to a nearby Safeway store where she purchased a cup of coffee. The clerk who sold her the coffee noticed that there was blood on Danner's hand, shirt, and money.

---

[2] This video was shown to the jury.

4

The clerk later testified that Danner "seemed a little twitchy and not entirely present in that she was in her head." RP at 281.

B. POLICE CONTACTS AND INVESTIGATION

Danner sat down outside the store to drink her coffee. Someone reported that there was a woman in or near the store covered in blood, and Captain Bradley Frafjord of the Aberdeen Fire Department and Lieutenant Warden Chastain of the Aberdeen Police Department contacted Danner.

Chastain was the first to arrive. He knew Danner and was aware that she had had interactions with other officers in the area for about 10 years.

Chastain noticed that Danner's left hand was covered in blood, that she had dots of blood on the back of her right hand, and that she had blood on her clothing. He asked Danner what had happened to her hands and if she was okay, and she responded "that she had a couple cuts on her hand, but that she was fine." RP at 303. She showed Chastain her hands, and he observed a cut across her left index finger's knuckle and her right palm.

When Chastain asked Danner for more detail about what had happened, she did not respond. Chastain later testified that before the fire department arrived, Danner's demeanor was similar to what it had been during some of his prior contacts with her, "[v]ery casual" and flirtatious. RP at 306.

When Frafjord arrived, he asked Danner about the blood on her hands and noticed that her hands had some small scratches or cuts on them. Although Danner conversed with him and at one point asked him if she needed stitches, she would not tell him how she had been injured or show him her hands so he could take a closer look at them.

5

Being familiar with Danner, Chastian could see that she was getting upset with Frafjord and told him to focus on treating her injuries. "At one point [Danner] got up and start[ed] coming at [Frafjord] fairly aggressively, so [he and Chastain] backed up." RP at 290. Concerned for his safety and unable to communicate with Danner, Frafjord left Danner with Chastain.

Chastain later testified that Danner's agitation with Frafjord was typical for her and that she did not appear to be "overly anxious" and her speech was coherent. She showed no indication that she was responding to anything that he could not see. Frafjord later testified that when he was asking Danner questions outside the store, she appeared to respond in a way that indicated she was aware he was there and understood what he was asking. After Frafjord left, Chastain continued to talk to Danner in an attempt to find out what had happened because, unaware of the murder, he was concerned that there could have been a fight at the homeless encampment and someone else might be in need of help. But when he asked Danner how she became injured, "[s]he just would stare at" him. RP at 311.

At one point during their conversation, Danner stood up and started taking off some of her several jackets to show him a Boy Scout shirt that she was wearing. At this point, Chastain could tell that Danner was not going to give him any more information about her injuries. Because her injuries did not appear to be serious, Chastain left to assist another officer.

As Chastain arrived to assist the other officer, the call about the stabbing at the Inn came over the radio and he responded to the Inn. When he was at the Inn he was told that a woman had been involved in the stabbing. Chastain suspected that Danner had been involved, and he returned to Safeway with King.

6

They found Danner a few blocks away from the Safeway. When King asked her about her injuries, she responded that her hands were cut, but she did not say anything about how she became injured. Chastain and King took Danner into custody and transported her to the jail.

At the jail, Chastain and King processed Danner for evidence. Chastain later testified that compared to other interactions he had had with Danner, she appeared "a little more calm." RP at 235. He noted that "[s]he just seemed more casual and unaffected by anything. She was carrying on conversations like you and I talking right now." RP at 325.

Chastain assisted with the evidence collection, but he allowed King to do the majority of the processing. While processing Danner, King engaged in "casual conversation" with her. RP at 346. She talked about being homeless, trying to find housing, how she liked coffee, and "general things like that." RP at 346. Although Danner was loud and animated, as she often was, King found her conversation to be logical and coherent. It did not appear that she was responding to things that were not there or things he could not see or hear.

At one point Chastain asked Danner what had happened to her hands, and she told him that she had had a billing dispute with Inn. And she told Chastain that "she went back and she kicked [the woman at the hotel] between the legs." RP at 350. Danner then started talking about how it was a good thing that she kept her receipts and was silent for a while.

Danner then asked King if he wanted to know "what this is all really about?" RP at 351. King told Danner that she might feel better and relieve her conscience if she told him what it was about. RP at 351. "She [then] told [King] that she . . . had stabbed somebody to death. And then she said that she had used a fork and stabbed them in the face." RP at 351. Danner also told the

officers about having been abused by her father and asserted that "Lady Gaga and Gwen Stefani [were] haunting her." RP at 357.

At one point during the evidence gathering, the officers thought they saw something in Danner's hair and they attempted to have her comb out her hair over some butcher paper. But when they told her that they wanted her to do this to gather evidence, she refused to continue and threw what they had collected to the ground.

After the officers completed gathering evidence from Danner, they allowed her to wash her hands. At one point when King asked Danner about the scratches on her arms, Danner responded "that the Asian lady [had] done did an entanglement," and had "put up a fight." RP at 356. Danner did not mention hearing a voice telling her to kill Kim or anything similar.

The nurse who later treated Danner's wounds at the hospital found Danner to be "agitated at times." RP at 410. Danner told the nurse that she had been overcharged for her room and that she had just killed the woman who had overcharged her. Danner repeated this statement multiple times.

After processing Danner, the officers retraced her steps and continued to search for the knife. A knife was found in Fernandez-Island's tent, and no one in the area claimed the knife. But no one specifically identified this knife as the knife that had been used in the attack.

## II. PROCEDURE

### A. COMPETENCY RESTORATION, PLEA, AND ORDERS FOR SANITY EVALUATIONS

The State charged Danner with first degree premeditated murder. Danner was initially found incompetent to participate in her defense. After competency restoration treatment, the court found Danner competent, and Danner pled not guilty by reason of insanity.

After Danner entered her plea, the trial court granted Danner's request for an order authorizing the expenditure of public funds for a psychological evaluation to determine whether she met the requirements of the insanity defense under RCW 9A.12.010.[3] Dr. Mark Whitehill, a licensed psychologist, concluded that Danner was unable to tell right from wrong at the time of the offense as the result of a mental disease or defect and therefore qualified for the insanity offense codified under RCW 9A.12.010(1)(b).[4]

In light of Dr. Whitehill's conclusion, the trial court granted the State's motion for a second examination by a psychiatrist or psychologist at Western State Hospital (Western State) pursuant to RCW 10.77.060(1)(a).[5] The court's order required Danner to be examined "by a psychiatrist or psychologist as designated by staff at [Western State]." Clerk's Papers (CP) at 72.

---

[3] Washington's insanity defense is codified under RCW 9A.12.010, which provides:

> To establish the [affirmative] defense of insanity, it must be shown that:
>     (1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:
>     (a) He or she was unable to perceive the nature and quality of the act with which he or she is charged; or
>     (b) He or she was unable to tell right from wrong with reference to the particular act charged.
>     (2) The defense of insanity must be established by a preponderance of the evidence.

[4] Although Dr. Whitehill's report was marked and made part of the record, it was not admitted or presented to the jury.

[5] RCW 10.77.060(1)(a) provides:

> Whenever a defendant has pleaded not guilty by reason of insanity . . . the court on its own motion or on the motion of any party shall either appoint or request the secretary to designate a qualified expert or professional person, who shall be approved by the prosecuting attorney, to evaluate and report upon the mental condition of the defendant.

At Western State, Danner was examined by two psychologists, Dr. Thomas LeCompte and Dr. Megan Kopkin, and an intern, Heidi Putney. They issued a single report in which they concluded that Danner qualified as insane at the time of the crime.[6]

After receiving the Western State report, the State filed a motion requesting a third evaluation to be performed by Dr. Alan Newman, M.D., a forensic psychiatrist. In its motion, the State stated that it was seeking this evaluation because it "disagree[d] with the legal conclusions of both evaluators." CP at 152. It further stated that Dr. Newman had conducted a preliminary review of the existing evaluations, the police reports, and the discovery, and had preliminarily concluded that Danner was not insane at the time of the crime under the Washington insanity standards.

The State asserted that, unlike the other examiners, Dr. Newman was a psychiatrist, so it "anticipate[d that] Dr. Newman's evaluation [would] differ substantially from the previous evaluations because Dr. Newman is a psychiatrist and physician, and his evaluation will focus on topics that are outside of the professional purview of a psychologist." CP at 152. But the State did not explain what "topics" it was referring to.[7] CP at 152.

A commissioner granted the State's motion for a third sanity evaluation to be conducted by Dr. Newman. Danner moved for revision of the commissioner's order.

In her motion to revise, Danner argued that the State was not entitled to a third evaluation because it had already obtained an order for an evaluation at Western State and there was no

---

[6] Although the Western State report was marked and made part of the record, it was not admitted or presented to the jury.

[7] The record before us does not contain any response to the State's motion.

10

authority permitting the State to request an additional evaluation. Danner also asserted that she should not be required to waive her right to self-incrimination and be subject to yet another examination on behalf of the State.

The State responded that there was statutory support for an additional examination and that Danner had already "[e]ssentially" waived her right against self-incrimination by submitting to the two prior examinations. CP at 163 The State also asserted that it was entitled to present its own evidence from an expert of its own choosing because it found the expert opinions in the Western State examination "to be lacking" and it "disagree[d] with the legal conclusion." RP at 179. Additionally, the State also argued it was seeking review by Dr. Newman, who was a psychiatrist rather than a psychologist, "[s]o the thrust of his examination would probably be more on a medical basis than a psychologist." RP at 183. But the State did not explain why it found the prior experts' opinions "to be lacking" beyond the fact the State disagreed with their conclusions and the evaluators were not psychiatrists. RP at 179. Nor did the State explain how a medical opinion might differ from a psychologist's opinion.

The trial court's oral ruling on the motion for revision focused on the State's right to an expert of its own choosing and whether an additional examination was permitted under the statutory scheme. The trial court denied the motion to revise the commissioner's ruling. Dr. Newman concluded that Danner did not qualify for the insanity defense.[8]

---

[8] Although Dr. Newman's report was marked and made part of the record, it was not admitted or presented to the jury..

B. TRIAL TESTIMONY

After the State obtained Dr. Newman's evaluation, the case proceeded to trial. The State's witnesses testified about the murder and investigation as described above.

1. DEFENSE WITNESSES

After the State rested, Danner presented her insanity defense. Danner's witnesses were the three examiners who had concluded that she was unable to know the difference between right and wrong at the time of the crime: Dr. Whitehill, Dr. LeCompte, and Dr. Kopkin.

a. DR. WHITEHILL'S TESTIMONY

Dr. Whitehill testified that he had interviewed Danner for about two and a half hours, reviewed Danner's legal file, reviewed her mental health records, and reviewed several self-administered psychological tests that Danner had completed after the interview.

Dr. Whitehill concluded that Danner suffered from a mental disease, Schizoaffective Disorder Bipolar type, and that she suffered from this mental disease on January 30, 2019. He also concluded that at the time of the crime, Danner "had the capacity to appreciate the nature and quality of her behavior," in other words, she knew "she was stabbing." RP at 513. But he ultimately concluded that she was unable to tell right from wrong when she stabbed and killed Kim.

Dr. Whitehill testified that during his interview with Danner, she told him that she believed Kim had overcharged her for a hotel stay and that in his opinion this was part of Danner's delusional belief system. He stated, "In this particular instance that was a belief that could motivate a number of rather bizarre behaviors and aggressive behaviors in advance of the tragic events of January 30th, 2019." RP at 524.

Dr. Whitehill acknowledged that during the interview Danner told him that after the initial stabbing, a voice told her to let Kim die, so she returned and continued to stab Kim. Dr. Whitehill further testified that Danner also said "that she didn't want Mrs. Kim to suffer." RP at 527. He opined that this was part of Danner's delusion and that it was a "reasonable interpretation" that the direction to let Kim die could have influenced Danner's decision to kill Kim so she would not continue to suffer. RP at 528.

Dr. Whitehill further testified that "nothing in [the] interview" suggested that the voice Danner heard "was divine in nature." RP at 526. But he agreed that this audio hallucination was part of his basis for determining that she did not know right from wrong. He also considered Danner's other behaviors during the day that suggested "disorganized behavior," such as removing articles of clothing, saying bizarre things, "putting herself in positions that are . . . unusual." RP at 528.

Dr. Whitehill opined that at the time of the crime, Danner was experiencing "a manic episode." RP at 528. He noted that the fact Danner stabbed Kim 25 times and "that level of hyper excitability manifesting itself in such aggressive action would be reflective of a manic episode, plus other dimensions as well." RP at 528-29.

Dr. Whitehill did acknowledge that Danner chose to stash her bags outside the Inn before entering the lobby and that she gathered her belongs afterwards. He admitted that this took some degree of decision making, but he did not believe that it was "necessarily tied to what she [was] about to do." RP at 531.

b. DR. LECOMPTE'S TESTIMONY

Dr. LeCompte testified about the sanity evaluation conducted at Western State. He testified that although he conducted this evaluation with Dr. Kopkin and an intern, he came to his own independent conclusions.

Dr. LeCompte testified that he reviewed all of the discovery documents, reviewed Danner's mental health hospitalizations and participation in outpatient care, and interviewed Danner. He stated that since 2009, Danner had been at Western State numerous times and that some of these stays were for competency assessments and competency restorations on other charges. These admissions were in 2009, 2012, 2015, 2016, 2018, and 2019.

Dr. LeCompte concluded that on January 30, 2019, Danner suffered from a mental disease and effect, Bipolar Disorder 1 "with psychotic features." RP at 561. He stated that psychosis includes "disorganized thought processes, paranoid grandiose, auditory or visual hallucinations," and sometimes "poor ability to focus their attention." RP at 562.

As Dr. Whitehill had, Dr. LeCompte concluded that Danner "could understand the nature of her act at that time" she killed Kim. RP at 562. But he also concluded that at the time of the murder she was experiencing a manic episode and did not have "the capacity to understand the difference between right and wrong." RP at 563. He stated that although Danner could understand she that was stabbing a person, she could not perceive that this act was wrong.

Dr. LeCompte testified that he reached this conclusion because many of Danner's actions after the stabbing demonstrated that she did not attempt to hide or avoid getting caught. He further noted that "some of her conduct that occurred immediately following [the murder] was . . . pretty disorganized and it showed a pretty poor awareness of the enormity of the act or the fact that it

would be considered a . . . foreign act." RP at 563. Specifically, he stated that Danner's going to Starbucks to purchase a coffee with blood on her and her going to the encampment, where she would be around a lot of people who could see her, were acts that were inconsistent with knowing that she had done something wrong. He also noted that Danner did not try to cover herself up, change her clothes or otherwise rid herself of the bloody clothes, or clean up. She also did not leave Safeway after getting her coffee, indicating she was not worried about being caught by the police. On cross-examination, the State challenged Dr. LeCompte's conclusion that Danner's actions indicated an inability to understand she had done something wrong and asked LeCompte if certain of Danner's actions actually suggested that she was capable of some kind of rational thought process. Specifically, the State suggested that Danner's telling others that the blood on her was from the cuts to her hands, her attempts to wipe the blood off her hands with napkins when she left the Inn, and her delay in admitting to law enforcement all suggested that she was aware she had done something wrong and did not want others to find out. It also suggested that her walking into traffic could have demonstrated an attempt to quickly distance herself suggesting that she knew she had done something wrong. Additionally, the State suggested that there could be other reasons that Danner did not attempt to hide or to clean up related to her homelessness and that her decision to disclose the murder to King after he told her she might feel better suggested she knew what she did was wrong.

Dr. LeCompte responded that although some of Danner's behaviors might have suggested she had some rational thought process and she eventually admitted to killing Kim, many of Danner's behaviors, such as her failure to wash off the blood despite being near a river and her references to being haunted, did not suggest she knew what she was doing when viewed in context.

Dr. LeCompte also testified that whether Danner's belief she had been overcharged by Kim was a delusional belief was not clear because she could have just been mistaken. But he testified that even if Danner had been overcharged, at some point her belief may have become delusional because it persisted even after others had explained to her that she had not been overcharged and an element of delusion is that a belief becomes impermeable to any disconfirming information. Dr. LeCompte stated that even if Danner's belief was correct, her response to it was disproportional, and this contributed to his opinion that Danner could not tell right from wrong.

The State challenged Dr. LeCompte's conclusion that Danner's disproportional response was evidence of delusion, noting that Danner had admitted that she believed violence was appropriate if someone disrespected her. In response, LeCompte acknowledged that a year or more after the incident Danner continued to say that "violence could be appropriate in some situations," such as when someone was disrespectful. RP at 588. And Dr. LeCompte also acknowledged that Danner had history of aggressive conduct and that this was related to "[t]he lifestyle she's led for the past several years," which "has included violent conduct in response to what she perceives as people doing her wrong or defending herself." RP at 588.

### c. DR. KOPKIN'S TESTIMONY

Like Dr. LeCompte, Dr. Kopkin concluded that on the day of the incident, Danner suffered from a mental disease, Bipolar 1 Disorder with psychotic features, and that at the time of the murder she was able to perceive the nature and quality of the act. Dr. Kopkin also concluded that Danner was not able to discern right from wrong at the time of the crime.

Dr. Kopkin testified that during the interview with Danner, Danner disclosed that she believed Kim had overcharged her and she was frustrated and angry about having been

16

overcharged. Danner stated that when she returned to the Inn on the date of the incident, "she hoped that Mrs. Kim wasn't there," and that she had hidden the knife when she entered the lobby. RP at 607.

On cross examination, the State asked if this was evidence that Danner had "some degree" of knowledge that what she was about to do was wrong. RP at 608. Dr. Kopkin agreed that there was some evidence suggesting that Danner had a degree of understanding of the wrongfulness of her behavior at the time of the incident, but she testified that the totality of the information demonstrated that Danner's capacity to discern right from wrong with regard to the attack was "impaired" or "deficient." RP at 606. Dr. Kopkin admitted, however, that this did not mean that Danner had "no understanding." RP at 606.

When the State asked Dr. Kopkin what other motive Danner would have to harm Kim, Dr. Kopkin responded that Danner could have been reacting to the disagreement, but "there was more of a delusional or psychotic aspect to the reason that she went back in and perceived this miscommunication, there was a psychotic aspect to this." RP at 607. Dr. Kopkin emphasized that Danner's persistent belief despite being shown evidence to the contrary was delusional. But Dr. Kopkin admitted that that Danner's initial hope that no one was at the Inn when she first approached, Danner's admission that she was scared when she entered the lobby, and Danner's act of hiding the knife when she entered did reflect that Danner knew "[t]o some degree" what she was planning to do was wrong. RP at 608-09.

Dr. Kopkin also agreed that Danner told her she tried to call 911 after the initial attack. Dr. Kopkin admitted that it was possible that this could have demonstrated that Danner knew that someone had been harmed and needed help, but Dr. Kopkin stated that there was "no data"

17

revealing why Danner may have tried to call 911. RP at 610. And given her prior history of calling 911 in relating to her disagreements with Kim, it was also possible Danner was attempting to call 911 "to simply talk to the police more about this disagreement." RP at 610.

2. STATE'S REBUTTAL WITNESS: DR. NEWMAN

Following Dr. Kopkin's testimony, Danner rested her case, and the State called Dr. Newman to rebut Danner's defense. Like Dr. LeCompte and Dr. Kopkin, Dr. Newman concluded that Danner suffered from a mental disease or defect, specifically "Bipolar 1 disorder severe with psychotic features." RP at 47.

Dr. Newman described his interview with Danner. Danner told him that she was homeless and "she did not like staying in encampments because she was afraid that she might be robbed; that her things might be stolen." RP at 55. She said she would try to stay with friends and that she would occasionally use her SSI benefits to pay for a hotel. She stated that she had stayed at various hotels in Aberdeen and other places, and she explained that she believed some of them might be trying to poison or otherwise harm her.

Danner also told Dr. Newman about her stay at the Inn in November 2018, and the resulting billing dispute. She stated that she "was extremely upset about that" and said that she had called the police and complained. She further stated that about a month after the billing incident, "she confronted the operator of the [Inn], Mrs. Kim." RP at 56. Danner asserted that Kim had kicked her and that she (Danner) called the police for permission to kick Kim back. She told the police about the billing dispute, but Dr. Newman stated that it did not appear that the issue was resolved at the time of that confrontation, and Danner "was still thinking about it." RP at 57.

As to January 30, 2019, Danner told Dr. Newman that "she was wandering around town," and had been seen by many people. RP at 57. She stated that "when she found herself in front of the [Inn]," she began to think about the billing dispute. RP at 57. Then she began "thinking about whether or not Mrs. Kim was there and told [Dr. Newman] that part of her hoped [Kim] would be there and part of her hoped she wouldn't be there. And at that time, she decided to attack her, to stab her" and she took her knife out of her backpack. RP at 57. At this point, Danner was still angry about the overcharging event. Danner told Dr. Newman that "she made that decision [to kill Kim] fairly close to when she did it." RP at 78.

Although she had not mentioned this to the other examiners, Danner told Dr. Newman that when she was outside the Inn "looking for her knife in her backpack," she heard the voice of man that she did not recognize "that said something like, 'Go on through,' " or something to that effect. RP at 59. Danner stated that this voice "was outside of her," but she was not clear about whether she thought the voice was encouraging her to act or not. RP at 60. Dr. Newman testified that because Danner "said that she didn't even experience that voice until she was looking for the knife," "whether that voice was a real voice or just a very powerful thought in her head" was not relevant because Danner "had already made the decision [to harm Kim]." RP at 59. Danner also did not tell Dr. Newman that she felt compelled to obey the voice or that is was of "divine origin." RP at 62.

Danner then told Dr. Newman that after hearing the first voice, she entered the reception area and went to the coffee stand to make coffee while concealing the knife. After making the coffee, she put it down on the reception desk and attacked Kim. Dr. Newman testified that this was consistent with what he observed on the Inn's security video.

Danner next described stopping the attack and then returning and stabbing Kim again. "She said that at some point in the middle of these two events, she said she heard a voice that said, 'Let her die.' And she reported that voice to other evaluators as well." RP at 64. She stated "that she did not want Mrs. Kim to suffer; that she knew she had severely injured her and she didn't want her to be in pain or suffering. And so the final stabbing was, in her mind, a merciful thing to do because it would finish the killing and not leave the victim behind in a state of extreme pain." RP at 64. "[T]he entire event . . . took place in just a matter of less than a minute." RP at 64.

Dr. Newman noted that at some point in the video of the attack it looked like Danner was trying to pick up the phone, and she told him and other evaluators that she had intended to call 911. She told Dr. Newman that she thought that this "meant on some level that she cared, that she was calling to ask for help." RP at 65.

Dr. Newman further testified that after the incident Danner realized she was injured and bleeding. "So she was trying to decide what to do about her injuries but also what to do with the knife. And so the -- her immediate action was to dispose of the knife," which she referred to as "the murder weapon," by throwing it in the river at the homeless encampment. RP at 68. Dr. Newman noted that Danner told "the state evaluators" this same information. RP at 68. Dr. Newman testified that Danner's "use of the word murder, in [his] opinion, suggested . . . her awareness of what murder is, which is an attack on another person and not simply acting in self-defense." RP at 69-70. And he opined that her desire to rid herself of the knife and her calling the knife a "murder weapon" was evidence that she understood the "wrongfulness" of her actions. RP at 70.

During the interview, Danner expressed regret for what she had done, and she had expressed the same sentiment to other examiners. But Dr. Newman stated that this was not the same as saying that she felt sad or sorry when the incident took place.

When the State asked Dr. Newman if Danner had said anything about how she felt at the time of the stabbing or what prompted the stabbing, Dr. Newman responded Danner "certainly felt that it was justified based on what she felt Mrs. Kim had done to her; that even though she expressed awareness that it was a crime, she felt like she had been harmed by Mrs. Kim; and that, in a sense, she was justified to do what she did." RP at 66. She also said that at the time of the incident, "[s]he felt anger" towards Kim. RP at 66. Dr. Newman noted that "the attack itself [was] a very rageful act," and that the large number of stab wounds "suggest[ed] intense rage because it's far more than would just be necessary for just killing somebody." RP at 67.

In contrast to the other examiners, Dr. Newman testified that Danner's belief she had been overcharged was not delusional because he did not conclude that it was a product of her mental illness. Instead, he concluded it was more likely the result of miscommunication. Dr. Newman noted that Danner's history showed that "she ha[d] a lot of belief systems that look very delusional," for instance her concern that she was being pursued by the Mexican Mafia, her fear of cannibals, and her belief her father a part of a satanic cult, but a belief she was overcharged was less likely to be a delusion. RP at 72.

Dr. Newman also testified that whether the disagreement about the charges was delusional was ultimately irrelevant to his analysis. In explaining why he believed that the question of whether Danner's belief that the Inn's charges were incorrect was delusional was irrelevant, Newman stated that under the test applied in Washington, "the general approach to looking at right from wrong is

21

if a person's actions were related to a delusion, would that be the illegality of the action if the delusion was true." RP at 75.

Newman then testified:

So for example, I had a patient that I treated for many years and he had a delusional belief that his wife had been transformed into a sea witch, a sea monster. And he described the experience of finding his -- his wife, not thinking it was his wife, thinking it was a sea monster. And then to protect himself, he stabbed the sea monster. And he said that his memory was not even of seeing blood, that he thought it was saltwater that was -- and it was only after his treatment in the psychiatric hospital with anti-psychotics that he came to realize that that was not a sea monster that he had killed. It was his wife.

Well, if it had been a sea monster, he would have had the right to defend himself. If you went into your house and there was an alien or sea monster or something that you thought was about to kill you, you would have a right to protect yourself.

But if Ms. Kim -- Ms. Kim -- even if she had ripped [Danner] off, even if she'd done it on purpose, that doesn't mean you get to kill the person. In real life, I've been ripped off many times. It never justifies the act.

And so from my perspective, it would be good to know whether it was a delusional belief or not. But if it were a delusion, she would not have the legal authority to take the life of somebody who overcharged her.

RP at 75-76.

Ultimately, Dr. Newman concluded that Danner could tell the difference between right and wrong at the time she killed Kim. He considered the fact Danner initially hid the knife and used making coffee as a ruse in order to catch Kim unaware, her "fleeing [the] crime scene," her ridding herself "of the knife," and her fleeing the encampment when someone announced the police were coming, as evidence that she knew what she had done was wrong. RP at 82, 84.

C. CLOSING ARGUMENTS

1. STATE'S ARGUMENT

The State began its closing argument by stating that even though the State had the burden of proving the murder charge, the case ultimately came down to one issue, "could [Danner] tell that it was wrong to kill Mrs. Kim." RP at 106. After discussing the evidence and arguing that the evidence supported the elements of the murder charge, the State then turned to discussing the insanity defense.

The State argued:

> So it comes down to: Did that mental disease prevent her from knowing it was wrong to kill Mrs. Kim? That's the one thing you've gotta decide.
>
> The Judge has instructed you on the different standards, beyond a reasonable doubt, preponderance of the evidence, more likely than not.
>
> Folks, I'm going to put to you that the evidence shows that she may have had a twisted version of right and wrong, but she knew right from wrong. Folks, she went in there -- it's undisputed -- to right a wrong. Ripping somebody off is wrong. Okay. The Defendant believed she had been wronged. The act was in retribution for that wrong.
>
> Now, she told Dr. LeCompte, if you recall, months after, months after this -- remember I had to refresh his recollection -- she told Dr. LeCompte that she believed assaulting somebody was an appropriate response to being disrespected. Okay?
>
> Well, you know, she's homeless, folks. She was homeless at the time. And that may have had to be the way she had to live on the streets, you know. Potentially dangerous, especially for a homeless woman. She may have had to defend herself on occasion. You know. She carried knives. It's reasonable.
>
> *But it doesn't justify -- being overcharged, whether it was delusional or not, doesn't justify the killing -- there's no -- even if you believe -- even if you believe that she was delusional.* Okay? And everybody knows, folks -- you know, Dr. LeCompte and Dr. Kopkin said, "Well, we think it was delusional because she wouldn't listen to people who told her it wasn't true." Folks, everybody knows people that won't listen when somebody tells them that their belief isn't true. Okay?

Being chased by cannibals is delusional. Being overcharged is just right or wrong or a misunderstanding. It's not delusional.

*So like Dr. Newman said, if you don't know right from wrong, your delusion is that you're being attacked by a sea monster in your home. It's not wrong to defend yourself. But if somebody overcharges you, you leave them a bad Yelp. You don't kill them. Right? It doesn't justify the act. Her response was disproportionate perhaps. It doesn't mean that it was justified within a delusional belief system.*

. . . .

So folks, the only question in this case: Do you believe she could tell that it was wrong to kill Mrs. Kim? I put to you she could. The evidence is overwhelming she knew right from wrong, and that's why I'm asking you to find her guilty.

RP at 117-20 (emphasis added). Danner did not object to this argument.

2. DEFENSE ARGUMENT

In her closing argument, Danner's counsel attempted to address the State's reference to Dr. Newman's sea monster scenario. Counsel argued:

But I want to explain a couple things because I think Counsel for the State stated some inaccuracies. The sea monster is a totally misstated comment by Counsel for the State. That was only on the issue that Dr. Newman said that guy could not appreciate the wrongfulness of his -- I mean could not appreciate the nature and quality of his act because he thought he was stabbing a sea monster. And then the guy who cut his brother's head off, as like that's -- that's the only relevance there. That sea monster has nothing to do with this case so you should discard that.

RP at 122.

Danner's counsel also noted that every expert agreed that Danner suffered from a mental disease or defect and that she understood the nature and consequences of her act. Counsel then focused his argument on whether Danner had been able to perceive the wrongfulness of her act, noting that three of the four experts had opined that she could not, and was therefore insane at the time of the crime.

3. REBUTTAL

During rebuttal, recognizing that Danner's counsel had mischaracterized Dr. Newman's sea monster analogy as relating to the ability to perceive the nature and quality of the act prong of the insanity defense, the State first reminded the jury that the jury instructions told them that "what [the] lawyers say isn't evidence," and to rely on their own notes and memories if the lawyers' statements did not seem accurate. RP at 139.

The State then tied this reminder into Danner's counsel's argument about Dr. Newman's sea monster testimony, stating,

> And I point this out -- just a couple of things. Dr. Newman's example of the sea monster, you remember he was talking about how that is somebody who was unable to tell right from wrong. Because he went into his house. He thought there was a sea monster. Well, it's not wrong. We all agree it's not wrong to defend yourself against a sea monster in your house that's threatening you. Right? That's -- we all -- we all think that's okay. That's -- you're allowed to do that. Right? Trust your notes on that.

RP at 139-40.

The jury found Danner guilty of first degree murder. Danner appeals.

ANALYSIS

Danner argues that (1) the trial court abused its discretion when it permitted the State to conduct a third sanity evaluation, (2) the State engaged in prejudicial prosecutorial misconduct when it misstated the law on the insanity defense in its closing argument, (3) her trial counsel provided ineffective assistance of counsel when he failed to object to this improper argument or request a curative instruction, and (4) no rational jury would have rejected her insanity defense. These arguments fail.

## I. THIRD SANITY EVALUATION

Danner first asserts that the trial court abused its discretion when it required her to submit to a third sanity evaluation.[9] Assuming without deciding that it was error to require Danner to submit to a third evaluation and that this potential error implicated Danner's constitutional right against self-incrimination, any potential error was harmless because the facts Dr. Newman presented and based his opinion testimony on were the same facts that were disclosed in the earlier evaluations and relied upon by the other evaluators.

"Constitutional error is presumed to be prejudicial, and the State bears the burden of proving that the error was harmless." *State v. Nysta*, 168 Wn. App. 30, 43, 275 P.3d 1162 (2012). Constitutional error is "harmless if, in light of the entire trial record, we are convinced that the [factfinder] would have reached the same verdict absent the error." *State v. Romero-Ochoa*, 193 Wn.2d 341, 348, 440 P.3d 994 (2019). Under this test, we look to the "overall significance of the erroneously admitted or excluded evidence in this context." *Romero-Ochoa*, 193 Wn.2d at 348.

Danner's concern about permitting an additional evaluation was that this required her to participate in a third interview, which arguably implicated her right against self-incrimination. But Danner does not contend that the State would not have been allowed to call Newman to testify about any conclusions he could have drawn solely from reviewing the interviews and other evidence used for the first and second evaluations. Here, Newman's opinion testimony, which the jury found more persuasive than the other evaluators' opinions, was premised on the same facts

---

[9] "On appeal, [this court] review[s] the superior court's decision on the commissioner's ruling, not the commissioner's ruling itself." *State v. Meneese*, 174 Wn.2d 937, 942, 282 P.3d 83 (2012) (citing *State v. Ramer*, 151 Wn.2d 106, 113, 86 P.3d 132 (2004)).

the other evaluators relied on in forming their opinions rather than any new information gathered during the third evaluation.[10]

Because the record shows that Dr. Newman's opinion testimony about Danner's ability to understand right from wrong was based on the same facts available to the other evaluators without reference to any additional facts obtained at the third interview, the jury would have reached the same verdict regardless of whether a third evaluation was performed. Thus, we hold that any error in permitting an additional evaluation was harmless beyond a reasonable doubt, and this argument fails.

## II. PROSECUTORIAL MISCONDUCT

Danner next argues that the State engaged in prosecutorial misconduct by misstating the law on insanity in its closing argument while discussing Dr. Newman's sea monster analogy. We hold that this argument fails because the State's argument, taken in context, was not a misstatement of the law.

To prevail on a prosecutorial misconduct claim when, as here, the appellant failed to object to the alleged misconduct, the appellant must prove that the conduct was improper and " 'that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice.' " *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499, (2020) (quoting *State v. Walker*,

---

[10] The only fact that Dr. Newman specifically identified as having been revealed for the first time in his interview with Danner was her claim that she heard voices when she was outside the Inn while she was "looking for her knife in her backpack." RP at 59. But Newman did not conclude that this hallucinatory event played a role in the stabbing because Danner was already looking for her knife when she heard it, which Newman testified indicated that Danner had already decided to harm Kim when she heard these voices.

182 Wn.2d 463, 477-78, 341 P.3d 976 (2015)). We examine prejudice "in the context of the entire trial." *Walker*, 182 Wn.2d at 477.

Danner contends that the State misstated the law when it argued that her insanity defense failed because "killing a person within a delusion is still illegal." Br. of Appellant at 36. She contends that the improper "argument was based on [Dr. Newman's] erroneous belief that to be insane under Washington law, the conduct within the delusion must not be illegal." Br. of Appellant at 38.

Danner mischaracterizes the State's argument. Dr. Newman did testify that the conduct within the delusion still had to be "illegal[ ]."[11] RP at 75. But the State's argument did not emphasize that aspect of Dr. Newman's testimony. Instead, the State's argument, as a whole, was that a person may still be able to tell right from wrong even if they are otherwise delusional.

In the case of the sea monster scenario, Dr. Newman testified that the man's delusion prevented him from understanding the wrongfulness of his actions because he was incapable of understanding that the thing he was stabbing was not a threatening sea monster. The State's argument was that in this instance, unlike in the sea monster scenario, the fact Danner may have had delusional beliefs about whether Kim had wrongfully taken her (Danner's) money did not prevent Danner from understanding that killing Kim in retaliation for that supposed offense was wrongful.

Using an analogy like the sea monster analogy to support this argument risks confusion because the same scenario could arguably be used to demonstrate that the man involved was so

---

[11] Danner did not object to this testimony.

delusional that he did not understand the nature and quality of his act because he was incapable of recognizing his wife as a human.[12] But we hold that the State's argument, taken as a whole, focused on whether Danner's delusion would have rendered her incapable of understanding that her actions were wrongful.

Danner also argues that this portion of the State's closing argument "raised [her] burden by requiring the jury affirmatively find [that she] believed her conduct within the delusion was legal."[13] Br. of Appellant at 39. But, again, the State's argument focused on Danner's capacity to *understand* that her actions were wrongful despite her delusions; it did not require the jury to make an affirmative finding that Danner believed her conduct was lawful.

Danner further argues that this "misstatement of the law" was so prejudicial that no instruction could have cured the prejudice. Br. of Appellant at 41. She notes that the alleged

---

[12] Notably, in response to the State's argument, Danner's counsel erroneously argued that Dr. Newman had used the sea monster analogy when discussing the nature and quality prong of the insanity defense. Dr. Newman's testimony clearly tied this analogy to the ability to tell right from wrong prong of the insanity defense. Because Danner's counsel's argument did not accurately reflect Dr. Newman's testimony, the State's rebuttal included its caution to the jury that the lawyers' statements during closing argument were not evidence and that the jurors needed to rely on their memories and notes, not counsel's argument.

[13] Danner analogizes to *State v. Johnson*, 158 Wn. App. 677, 243 P.3d 936 (2010). The issue addressed in *Johnson* was the "fill in the blank" reasonable doubt argument, which is in no way similar to the argument at issue here, where the argument at issue has nothing to do with the burden of proof.

misstatement of the law was made more than once, and that this emphasis rendered any prejudice incurable. But because the argument was not a misstatement of the law, it was not prejudicial.[14]

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Danner further argues that her trial counsel provided ineffective assistance in failing to object to the above alleged prosecutorial misconduct and failing to request a curative instruction. This argument has no merit.

To establish ineffective assistance of counsel, Danner must show that (1) her counsel's performance was deficient and (2) that this deficient performance resulted in prejudice. *State v. Humphries*, 181 Wn.2d 708, 719-20, 336 P.3d 1121 (2014) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). A failure to demonstrate either deficient performance or prejudice defeats an ineffective assistance claim. *State v. Emery*, 161 Wn. App. 172, 188, 253 P.3d 413 (2011).

As discussed above, the State's argument was not improper. Thus, defense counsel did not provide deficient performance by failing to object to this argument. Danner's ineffective assistance of counsel claim fails.

---

[14] We also note that even when the appellant makes the requisite showing of incurability and overcomes waiver, we must then review the claim to determine whether there is a substantial likelihood that the misconduct affected the verdict. *State v. Gouley*, 19 Wn. App. 2d 185, 201, 494 P.3d 458, *review denied*, 198 Wn.2d 1041 (2022). Importantly, "a defendant might succeed in showing incurable prejudice from the improper statements and yet fail to demonstrate a substantial likelihood that the misconduct affected the verdict." *Gouley*, 19 Wn. App. 2d at 201; *see also State v. Emery*, 174 Wn.2d 741, 764 n.14, 278 P.3d 653 (2012). The former does not automatically establish the latter.

IV. Sufficiency of the Evidence: Insanity Defense

Finally, Danner argues that no rational jury would have rejected her insanity defense. This argument fails.

We review a jury's rejection of a defendant's insanity defense to determine "whether, [after] 'considering the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove the defense by a preponderance of the evidence.' " *State v. Chanthabouly*, 164 Wn. App. 104, 136-37, 262 P.3d 144 (2011) (quoting *State v. Matthews*, 132 Wn. App. 936, 941, 135 P.3d 495 (2006)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Moles*, 130 Wn. App. 461, 465, 123 P.3d 132 (2005). And we defer to the jury on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

Danner predominately argues that there was substantial evidence that she suffered from a mental disease or defect despite some degree of disagreement as to her exact diagnosis. Although the evidence that Danner suffered from a mental disease or defect that resulted in delusions or mood elevations that could potentially impact her behavior was uncontested, that alone is not sufficient to establish an insanity defense. Danner also had to prove by a preponderance of the evidence that her mental disease or defect rendered her "unable to tell right from wrong with reference to the particular act charged." RCW 9A.12.010(1)(b).

As to this element, Danner argues that she presented sufficient evidence to prove her insanity defense because all four experts found that she "suffered from a severe mental health disease that caused severe symptoms of delusions, grandiose, audible hallucinations, disorganized thoughts," and other symptoms, and three of those experts concluded that her behavior "before, during and after the crime supported their conclusion [that she] was insane." Br. of Appellant at 56. But Danner's argument comes down to the credibility, weight, and persuasiveness of the various experts' testimonies. Although three of the four experts agreed that Danner's mental status affected her ability to tell right from wrong when the incident occurred, this is not just a numbers game, and the jury could have found Dr. Newman's testimony about whether Danner could understand right from wrong the most credible or persuasive.[15]

Because we defer to the jury on such matters, Danner does not demonstrate that the jury's conclusion that she had failed to prove her insanity defense by a preponderance of the evidence was not supported by the evidence. Accordingly, this argument fails.

CONCLUSION

We hold that (1) any potential error in requiring Danner to participate in a third evaluation was harmless error because Dr. Newman's opinion testimony was premised on the same facts disclosed in the earlier evaluations and relied on by the other evaluators in forming their opinions

---

[15] Newman based his conclusion that Danner was able to tell right from wrong at the time of the stabbing on several factors, including that Danner hid the knife from view before entering the lobby, that she used a ruse of getting some coffee to allow her to approach Kim, that she told him she had discarded the knife in the river, and that she failed to initially disclose that she had stabbed Kim when questioned. Danner does not assert that these facts are not sufficient to support Newman's conclusion; she only discusses how the evidence supported the other experts' conclusions.

rather than any new information gathered during the third evaluation, (2) the prosecutor's argument was not improper, (3) defense counsel did not provide ineffective assistance by failing to object to this argument, and (4) the evidence was sufficient to allow the jury to have found that Danner failed to prove her insanity defense. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Cruser, A.C.J.

We concur:

Veljacic, J.

Price, J.